UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

BERND BILDSTEIN,                                    Index No.: _____

               Plaintiff                          _____

      - against -                               FILED    VERIFIED COMPLAINT
                                IN CLERK ...D.N.Y    **CV 03-2034**
                           U.S. DISTRICT
JEROME SWARTZ, HARVEY P. MALLEMENT, APR 2 9 2003 **Jury Trial Demanded**
RAYMOND R. MARTINO, GEORGE BUGLI-   BROOKLYN OFFICE
ARELLO, CHARLES B. WANG, TOMO
RAZMILOVIC, LEO A. GUTHART, JAMES
SIMONS SAUL F. STEINBERG, LOWELL                    **GARAUFIS, J.**
FREIBERG and SYMBOL TECHNOLOGIES, INC.,

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x     **POLLAK, M.J.**

      Plaintiff alleges, upon information and belief based upon, inter alia, the investigation made

by and through his attorneys, except as to those allegations which pertain to plaintiff himself,

which are made upon knowledge, as follows:

      1.     Jurisdiction of this Court is founded upon the Securities Exchange Act of 1934,

as amended (the "Exchange Act"), 15 U.S.C. §78aa and the principles of pendent jurisdiction.

      2.     The claims herein arise under §14(a) of the Exchange Act, 15 U.S.C. §78n(a), and

Rule 14a-9 of the Securities and Exchange Commission promulgated thereunder and the

principles of common and state law.

      3.     In connection with the acts, omissions, conduct, and wrongs alleged herein,

defendants use the means and instrumentalities of interstate commerce and the mails in

committing the wrongs alleged herein, some of which occurred in this district.

      4.     Plaintiff is currently a joint owner of 757 shares of Symbol Technologies, Inc.

("Symbol"), a Delaware corporation, and has been a shareholder of Symbol continuously since

1989, and throughout the times hereinafter alleged to the present. Symbol's stock is traded on the New York Stock Exchange. Its stock was split 3-for-2 on each of June 14, 1999, April 2, 2000, and April 16, 2001. Symbol has approximately 230,565,000 shares outstanding.

5.     Plaintiff brings this action derivatively in the right of and for the benefit of Symbol. This action is not a collusive one to confer jurisdiction on this Court which it would not otherwise have.

6.     Defendants Jerome Swartz, Harvey P. Mallement, Raymond R. Martino, George Bugliarello, Charles B. Wang, Tomo Razmilovic, Leo A. Guthart are and were at all relevant times, members of Symbol's board of directors. Defendant James Simons became a member of the board of directors on May 8, 2000.

7.     Defendants Saul F. Steinberg and Lowell Freiberg were directors until May 2001.

8.     Defendant Swartz was, at all relevant times until July 1, 2000, Symbol's chief executive officer ("CEO") and chairman of its board of directors. On July 1, 2000, he stepped down as CEO and became Symbol's chief scientist.

9.     Defendant Razmilovic was at all relevant times, until July 1, 2000, Symbol's president and chief operating officer. On July 1, 2000, he became the chief executive officer until February 1, 2002. He did not seek reelection as a director.

10.    Defendant Martino is, and was at all relevant times, the vice chairman of the board of directors of Symbol, and he is employed by Symbol on a part time and consulting basis. He is a participant in compensation plans and programs applicable to officers and employees.

11.    Defendants Swartz and Razmilovic received the following compensation:

|      | Swartz      | **Options | Razmilovic  | **Options |
|------|-------------|-----------|-------------|-----------|
| 2001 | $1,075,327  | 300,000   | $1,010,455  | 375,000   |
| 2000 | 2,123,897   | 375,000   | 2,055,165   | 937,500   |
| 1999 | 2,008,607   | 708,750   | 1,408,122   | 405,000   |

**Adjusted for splits

12.     In 1999, defendant Martino's compensation was $150,000. As of February 15, 2000, Symbol entered into a new employment agreement with defendant Martino as a part-time consultant assisting the chairman of the board and the president, which would terminate on February 15, 2005 at an annual salary of $100,000 plus a car allowance and an expense account. In addition, in February 2000, he was granted an option to purchase 50,000 pre-split share of Symbol's stock, exercisable at $80.625 per share, the pre-split market price on the date of grant. This stock option was not expressly required under the new agreement and the board of directors can award him additional stock options.

13.     All the individual defendants who are or were neither officers nor employees of the company, are referred to as the "non-employee directors".

14.     The individual defendants, other than defendants Steinberg and Freiberg, acting as members of Symbol's board of directors, authorized the distribution of Proxy Statements for the annual meetings held on May 8, 2000, May 21, 2001 and May 6, 2002, (the "Proxy Statements"). Defendants Steinberg and Freiberg authorized the distribution of proxy statements for the annual meetings of May 8, 2000 and May 21, 2001. The directors authorized the aforesaid distribution to solicit the votes of Symbol's shareholders.

15.     All the defendants permitted the use of their names to solicit the proxies for, inter alia, the approval of the plans and the election of the board of directors.

- 3 -

16.     The proxy statement for the meeting of May 6, 2002, among other items, submitted for stockholder approval: (i) the election of six directors; (ii) the vote on a proposal to adopt the 2002 Directors' Stock Option Plan; and (iii) the ratification of the appointment of independent auditors for 2002.

17.     The proxy statement for the meeting of May 21, 2001, among other items, submitted for stockholder approval: (a) the election of eight directors; (b) the amendment of the 1997 Employee Stock Option Plan; and (c) the ratification of the appointment of independent auditors for 2001.

18.     The proxy statement for the meeting of May 8, 2000, among other items, submitted for stockholder approval: (1) the election of ten directors; (2) the approval of the Directors' Stock Option Plan; and (3) the ratification of the appointment of independent auditors for 2000.

19.     The solicitations sought the approval of company's stockholders for the foregoing, and they gave their approval at the annual meetings held in May 2000, May 2001, and May 2002.

20.     The Directors' Stock Option Plan for 2000 provides for the grant of an option to purchase 50,000 pre-split shares (75,000 post-split) of Symbol's stock to each non-employee director and the grant of an option to purchase 50,000 pre-split shares (75,000 post-split) on Symbol stock to each new non-employee director at the date of election. The options were exercisable at the market price of their underlying stock on the date of grant. The options expire 10 years from the date of grant, but events may result in an earlier termination. Under the Plan, 500,000 pre-split share (or 750,000 post-split shares) are available for options, and half of that total are now available for future grants. The Plan replaced an earlier plan that granted annual options to purchase 2,500 shares and an initial grant upon election, to purchase 10,000 shares.

- 4 -

21.     The 2002 Directors Stock Option Plan provided for a grant to each non-employee director who had been a director of Symbol for at least eleven months, and upon his reelection at the annual meeting, to automatically be granted an option to purchase 20,000 share post-split common stock. The options would last for ten years, and were to be exercisable at the fair market value of said common stock, as reflected on the New York Stock Exchange on the date of the grant. There were other conditions prescribed for the exercise and for termination.

22.     All of the individual director defendants received option grants under the Plans. Thus, defendant Swartz received grants of 375,000 options (after giving effect to a 3-for-2 split) in 2000 and 300,000 options in 2001. Defendant Razmilovic received grants of 937,500 options (after giving effect to a 3-for-2 split) in 2000 and 375,000 options, which were cancelled in 2001.

23.     The financial statements, including the annual reports for the years ended December 31, 1999, 2000, and 2001 sent together with the proxy statements were an attempt to induce and influence Symbol shareholders to vote favorably for the proposals submitted by Symbol for shareholders' approval at the respective annual meetings.

24.     Symbol's financial statements contained materially false and misleading statements and omitted material facts in that Symbol represented in its annual reports that its accounting policy was consistent with Generally Accepted Accounting Principles ("GAAP") for revenue recognition and that revenue related to sales of its products and systems is generally recognized when products are shipped or services are rendered, and the risk of loss was passed to the customer, and the sale price is fixed or determinable and collectability is reasonably assured. However, Symbol materially misrepresented its quarterly and annual revenues and earnings by overstating its revenues and earnings to make them appear higher than those actually generated.

25.     Company did this by systematic "channel stuffing" transactions entered into at or near the end of each applicable fiscal quarter through which it purported to sell products to various value added resalers ("VARs"), and distributors, even though they had no firm obligation to pay for the products purportedly being purchased. Symbol recognized, as revenue, amounts associated with those transactions in contravention of its own accounting policy and GAAP.

26.     As part of that scheme, Symbol granted to the distributors and VARs the right <u>not</u> to pay for the products unless, and until, the distributors or VAR resold the product and/or given the unconditional and guaranteed right to return the products without paying for them. As a result, Symbol was able falsely to recognize revenue to which it had not earned. Thus, for example, at the end of the second and third fiscal quarters of 2000, Symbol overstated its revenues by approximately $10 million. At the end of the third fiscal quarter of 2000, Symbol solicited and accepted a purported order for approximately $5 million of its product from a VAR by agreeing that the VAR could return at no cost any product it was unable to resell and said VAR would receive an additional payment of one percent of the value of whatever product it returned. In fact, Symbol never shipped the products to VAR and consequently VAR never returned the products to Symbol.

27.     In December 2000, a certain VAR received a $50,000 rebate reflecting a one percent payment for the purported transaction. Notwithstanding the foregoing, Symbol similarly recognized and reported the revenue purportedly earned in this transaction.

28.     At the end of each fiscal quarter of 2000, one Robert Asti, Symbol's vice president of finance and operations, together with others, caused Symbol to enter into transactions with a distributor located in South America ("Distributor #1"), in which Distributor #1 agreed to place multimillion dollar orders for whatever products Symbol had sitting in inventory, even though

- 6 -

Distributor #1 had no need for the products. Instead of shipping the products to Distributor #1, Symbol merely stored the products in warehouses in New York (the "Warehoused Products"). Symbol and Distributor #1 agreed that Distributor #1:(1) had no obligation to pay for the Warehoused Products, and (ii) could "exchange" the warehoused products at no cost when it placed new orders for product it actually needed. Despite these terms, Asti and other high-ranking corporate executives at Symbol caused Symbol fraudulently to recognize and report the revenue purportedly earned from the bogus, end-of-quarter orders by Distributor #1.

29.     Another fraudulent technique used by Asti and other high-ranking corporate executives at Symbol to overstate Symbol's quarterly revenues and earnings involved transactions that certain Symbol executives commonly referred to as "Candy Deals." In these Candy deals, Symbol solicited VARs to order from distributors Symbol products for which the VARs did not have any end-user customers for the products. To induce the VARs to make such orders, Symbol promised (a) to repurchase the product from the VARs at the price the VARs paid the distributors, and (b) to pay the VARs an additional one percent of the purchase price.

30.     In these Candy Deals, Symbol did not sell the products directly to a VAR. Rather, Symbol sold products to a distributor, which either resold the products to a VAR or used the products to restock its supply of Symbol products and then sold other, Symbol products from its inventory to the VAR.

31.     Defendant Asti and other high-ranking corporate executives at Symbol caused Symbol to enter into such Candy Deals at or near the end of each of the first three fiscal quarters of 2000. Symbol recognized more than $10 million in revenues in connection with Candy Deals in these three quarters notwithstanding that Asti and other high-ranking corporate executives at Symbol knew that the transactions generated no net income for Symbol. On the contrary, Asti

and others at Symbol knew that the Candy Deals in fact resulted in a net loss to Symbol because (a) the price a VAR paid to the distributor for the products was higher than the price the distributor had paid Symbol for the products, which meant that Symbol had to repurchase the products at a price greater than the price at which it had sold the products, and (b) Symbol paid the VARs an additional one percent bonus to participate in the Candy Deals.

32.     A further fraudulent technique, used by defendant Robert Asti and other high-ranking corporate executives at Symbol to overstate Symbol's quarterly revenue and earnings involved the deliberate shipment to a customer of the wrong Symbol products at or near the end of a quarter when the Symbol products that the customer actually wanted were unavailable. Later, when the products that the customer actually wanted became available, Asti and others caused Symbol either to cancel the prior shipment or to accept the return of the wrong products, and then ship the correct products to the customer. In this way, Symbol prematurely recognized revenue for orders.

33.     For example, in June 2000, Symbol entered into a sham transaction with an end-user ("End-user #1") and a VAR ("VAR #3") involving approximately \$3.8 million of Symbol products that End-user #1 wanted but which would not be available for shipment until after the end of the quarter. For the sole purpose of fraudulently and prematurely recognizing revenue from the sale of these products to End-user #1 in the second fiscal quarter of 2000, Asti and others at Symbol arranged for VAR #3 to act as an intermediary in the transaction and to place an order in June 2000 for \$3.8 million of available Symbol products that neither VAR #3 nor End-user #1 wanted. Symbol agreed that VAR #3's bogus order would be cancelled and replaced in the following quarter by a genuine order for the products that End-user #1 actually wanted, after the desired products became available.

- 8 -

34. Asti was indicted for misconduct and has pled guilty for the false and misleading financial statements in violation of the securities laws.

35. Symbol, in March 2003, has announced that it is preparing a restatement of previously reported financial results, which it believes will cover the years 1999 through 2002. An error may result from, among other things, disregarding or misusing the facts that existed at the date the financial statements were prepared, and under GAAP and Accounting Principles Board releases, such errors must be corrected in the relevant period or periods.

36. The shareholders approved the sought-for requests, including the adoption and amendments of the Plans.

37. As a result of the stockholder approvals of the Plans, the various defendants received options to purchase Symbol stock and other valuable compensation and benefits.

38. All the defendants were negligent in that they knew or should have known that the proxy solicitations and the financial statements sent with such solicitations omitted to disclose the correct facts regarding the financial results of Symbol.

39. All the defendants were negligent in that they knew or should have known that the financial statements sent to Symbol shareholders were incorrect.

40. As a result of the materially false representations and omissions in the proxy statements, the stockholders gave the approvals sought for in each solicitation which has resulted in great injury to Symbol, which may also face class actions suits for fraudulent financial statements, and unfair benefits for the defendants.

41. Plaintiff have made no demand upon the board of directors of Symbol to institute and prosecute this action because such demand would be futile and hence is excused, because the non-employee directors, who are five of the eight members of the board are financially interested

in the Plans. In addition, three other board members, Swartz, Razmilovic and Martino lack independence because their compensation, they are, and were, employees of Symbol.

WHEREFORE, plaintiff prays for the following relief:

A.    Cancellation of all affirmative votes at the annual meetings for 2000, 2001, and 2002;

B.    Cancelling all awards under the Option Plans;

C.    Enjoining implementation of the Option Plans and any awards thereunder;

D.    Requiring defendants to account for all damage to Symbol;

E.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys fees and accountant's and expert fees; and

F.    Granting such other and further relief as this Court may deem just and proper.

BALLON STOLL BADER & NADLER, P.C.
Attorneys for Plaintiff

By _____
Irving Bizar (IB 1927)
1450 Broadway — 14th FL
New York, New York 10018-2268
T: (212) 575-7900
F: (212) 764-5060

Dated: New York, New York
April 21, 2003

O:\BIZAR\SYMBOL\BILDSTEIN.COM

- 10 -

STATE OF NEW YORK       )
                        } ss:
COUNTY OF NEW YORK      )

The undersigned BERND BILDSTEIN is plaintiff in the within action, verifies that he has read the foregoing COMPLAINT and knows the contents thereof, that the same is true to affirmant's own knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters he believes them to be true.

The grounds of affirmant's belief as to all matters not stated to be upon affirmant's knowledge, are as follows:

Records in his possession and investigations caused to be made on his behalf.

BERND BILDSTEIN

Sworn to before me this
  21st  day of April 2003.

Notary Public

WILLIAM J. MCCABE
Notary Public, State of New York
No. 02MC6030375
Qualified in New York County
Commission Expires September 7, 20.05

O:\BIZAR\BILDSTEIN. VER